**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

TREMAYNE JONES,

                              Petitioner,

          - v -                                                  No. 9:05-CV-915
                                                                      (LEK/DRH)

JAMES CONWAY, Superintendent, Attica Correctional
Facility,

                              Respondent.

**APPEARANCES:**                              **OF COUNSEL:**

TREMAYNE JONES
Petitioner Pro Se
02-B-1884
Attica Correctional Facility
Box 149
Attica, New York 14011-0149

HON. ANDREW M. CUOMO                          CHELSEA H. CHAFFEE, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Respondent
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**UNITED STATES MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION and ORDER[1]

        Pro se Petitioner Tremayne Jones ("Jones") was convicted by a jury of

manslaughter in the first degree, criminal possession of a weapon in the second degree,

and attempted assault in the first degree.  Trial Tr. at pp. 1057-59.  On September 4,

2002, Jones was sentenced to a determinate term of incarceration of twenty-five years for

manslaughter in the first degree, five years for criminal possession of a weapon in the

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4

second degree to run concurrently with the manslaughter conviction, and five years for attempted assault in the first degree to run consecutively with the manslaughter charge. Sentencing Tr. at p. 13.  Jones presently seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds: 1) the verdict was against the weight of the evidence and the trial court erred by submitting the charge of possession of a weapon to the jury; 2) a peremptory challenge constituted a *Batson* violation; 3) the trial court's jury instructions were confusing and prejudicial; and 4) the trial court erred in its *Sandoval* ruling and failed to call a mistrial based on the ruling.  Am. Pet. (Dkt. No. 5) at ¶ 12.  For the reasons which follow, it is recommended that the petition be denied.

## I. Background

On January 28, 2002, Jones and a co-defendant, Jonah Seymour, were indicted by a grand jury charging them with attempted murder in the second degree, assault in the first degree, attempted assault in the first degree, and criminal possession of a weapon in the second degree.  *See* People's Br. at p. 3.[2]  The indictment alleged that on or about October 14, 2001, Jones and Seymour shot at Jamar Williams and Freddie Brown.  *Id.* Williams was the only person injured and because the bullet was lodged in his back, it caused permanent paraplegia.  *Id.*  However, on February 5, 2002, Williams died due to complications from his injuries.  *Id.*  Therefore, on March 12, 2002, the grand jury returned another indictment charging both with murder in the second degree.  *Id.*

---

[2] A copy of the indictment was not provided.

On June 12, 2002, a *Sandoval* Hearing was held.[3]  *See* Hr'g Tr.  With respect to Jones' prior convictions, the court permitted the prosecution to ask whether Jones had been convicted of criminal possession of a controlled substance in 1996 and, if as part of a plea, he admitted to possessing cocaine with the intent to sell.  *Id.* at pp. 24-25.  The court stated that if Jones answered affirmatively to both questions, no further inquiries could be made.  *Id.* at p. 25.  If Jones denied either question, then the prosecution could delve into the subject.  *Id.*  The court held that no other prior convictions and/or bad acts could be raised at trial.  *Id.*

Jury selection began on June 17, 2002.  *See* Voir Dire Tr.[4]  After the initial round of voir dire, the prosecution utilized a peremptory challenge on prospective juror Theodis Mills.  *Id.* at p. 128.  The defense objected and raised a *Batson* issue claiming that there was no articulable reason to remove this African-American man.  *Id.* at pp. 128-29.  The prosecution's non-discriminatory explanation was that Mills did not appear to be listening to the court when he first entered the jury box.  *Id.* at p. 129.  The court responded by stating that:

> when [Mills] came into that room in the back I thought he was, I don't know the adjective I can use, but I was very much impressed by the fact that he didn't respond to me, he acted like he didn't know, had no idea how to react.  It was noticeable to me.  And at this point I can't honestly say that [the prosecution] has left out anybody who acted in that fashion.  He just seemed to me to be not responding or responsive.

---

[3]New York law affords a criminal defendant the right to a pretrial hearing concerning the admissibility of prior crimes and convictions to impeach a defendant's testimony at trial if he or she testifies.  *People v. Sandoval,* 34 N.Y.2d 371 (1974).

[4] Prior to jury selection, Jones' co-defendant, Seymour, pled guilty to manslaughter in the first degree and was sentenced to a term of incarceration of twenty years.  Voir Dire Tr. at pp. 2-8; People's Br. at p. 3.

*Id.* at p. 129.

The court concluded that the challenge was not discriminatory.  *Id.* at p. 130.

The trial commenced on June 18, 2002.  Trial Tr. at p. 2.  Officer Richard Cunningham of the Syracuse Police Department testified that at approximately 11:00 a.m on October 14, 2001, he received a call that shots were fired and a man was down.  *Id.* at pp. 33-35.  Cunningham stated once he reached the scene, he observed a black male on the ground with a "hole right near his right chest."  *Id.* at p. 36.  Cunningham stated he asked Jamar Williams if he knew who shot him and Williams' response was that he did not know.  *Id.* at p. 49.  Cunningham testified the area was searched and they noticed Freddie Brown standing on the sidewalk with blood on his shirt.  *Id.* at pp. 37-40 & 42-43.

Next, William Brown testified.  *Id.* at p. 51.  Brown was asked how he knew Jones and he stated "from doing a bid."  *Id.* at p. 53.  The defense objected and the court immediately cleared the jury out of the courtroom.  *Id.*  The court questioned the meaning of Brown's statement and he replied that he and Jones served jail time together.  *Id.*  The defense then made a motion for a mistrial and the prosecution stated that a curative instruction could remedy any harm done.  *Id.* at pp. 54-55.  The defense contended that the jury would understand the meaning of "doing a bid" because it is common knowledge.  *Id.* at p. 55.  The court took a brief recess and noted that a curative instruction would be proper, but the defense declined.  *Id.* at pp. 55-56.  The court denied the motion for a mistrial but ordered the testimony stricken.  *Id.* at pp. 56 & 84.

Brown continued his testimony and stated he was sitting on his porch at his mother's home and saw Jones standing on his sister's porch next door.  *Id.* at pp. 86-87.

Brown testified that he noticed Jones was wearing gloves and observed Jones walking towards the home of Seymour.  *Id.* at pp. 87-88.  He stated that while Jones and Seymour were at Seymour's home, he witnessed Williams come down the street and talk to Jones. *Id.* at pp. 91-96.  Brown testified that after words were exchanged between Jones and Williams, he heard gunshots and saw Jones firing in the direction of Williams.  *Id.* at pp. 97-100.  Brown stated he also heard Seymour firing a gun.  *Id.* at pp. 101-02 & 113. Brown testified that once the gunshots ceased, he saw Freddie Brown bending over Williams to help him off the ground.  *Id.* at pp. 102-05.  At that point, Brown testified that a number of people gathered around the scene, Freddie Brown went to find Williams' mother and Jones as well as Seymour left the area.  *Id.* at pp. 105 & 109.

Charlotte Brown, William Brown's sister, then testified.  *Id.* at p. 160.  She confirmed her brother's testimony and further stated that she observed Freddie Brown firing at Jones and Seymour during the shootout.  *Id.* at pp. 162-176.  She indicated that Seymour fired the first shot, which hit Williams, and that more gunfire erupted subsequently.  *Id.* at pp. 188-92.  Thereafter, Laura Mayfield testified that Jones and Seymour stayed at her house the night before the incident and on the morning of October 14, she noticed both leaving her house with a pair of gloves.  *Id.* at pp. 207-13.  Mayfield stated they returned a few hours later sweating and nervous.  *Id.* at pp. 213-20.  She testified that Jones and Seymour returned to her home a few weeks later at which time the police arrived at her house and arrested Jones and Seymour.  *Id.* at pp. 220-26.

Subsequently, Dr. Howard Simon of the Syracuse University Hospital testified that on October 14, he performed emergency surgery on Williams, removed a lung due to a

gunshot wound and observed that the bullet had injured his spinal cord rendering him paralyzed. *Id.* at pp. 289-301. He further stated that a few months after the surgery, Williams died from complications. *Id.* Next, Oscar Randle testified that two days prior to the incident, he told Seymour that Freddie Brown was looking for him. *Id.* at pp. 324-25. Randle stated Jones and Seymour inquired about obtaining a gun and in exchange for five hundred dollars, he gave Seymour a gun. *Id.* at pp. 326-33. At the same time, Jones stated he did not need a gun from Randle because he had already secured his own gun, a nine-millimeter. *Id.* at pp. 326-33.

Vernon Thompson, technical leader for the firearms and toolmarks section of the Center for Forensic Sciences, next testified that three casings found at the scene of the crime originated from a nine millimeter gun. *Id.* at pp. 405-06. He also noted there were six .40 caliber shell casings found at the scene. *Id.* at pp. 403-05. Thompson stated that both types of casings were consistent with being fired from a Glock type weapon. *Id.* at pp. 405-06 & 412. Thompson testified that after Williams died, the medical examiner was able to recover the bullet lodged in his back and a test conducted on that bullet showed that it was a .40 caliber projectile. *Id.* at pp. 424-25.

Thereafter, Freddie Brown testified. *Id.* at p. 446. Brown stated he and Williams were friends because Williams and his sister had a baby together. *Id.* at pp. 448-49. Brown testified that on the morning of October 14, 2001, Williams came to his house. *Id.* at pp. 449-51. Brown testified that while sitting on the porch, they saw Seymour and Jones down the street. *Id.* at pp. 451-55. Williams left but returned a few hours later. *Id.* Brown stated that when he saw Williams return, he was walking down the street and

picked up a gun he had "stashed." *Id.* at pp. 455-56.  Brown testified that as he

approached Williams, he noticed Williams was on the phone.  *Id.* at pp. 457-58.  Brown

testified that all of a sudden, he heard gunshots and ran behind a tree until he heard

Williams call to him for help.  *Id.* at pp. 458-59.  Brown stated he ran across the street to

help Williams, saw Jones and Seymour firing their weapons, pulled Williams toward a

fence and then began firing his own weapon at Jones and Seymour.[5]  *Id.* at pp. 459-62.

Brown testified that Jones and Seymour left the scene and while Williams was lying on the

ground, he told him to find his mother.  *Id.* at pp. 462-64.  Brown stated he went home to

get a sweatshirt to cover the blood on his shirt, brought Williams' mother to the scene and

then left before being thoroughly questioned by the police.  *Id.* at pp. 465-69.  Later that

same day, Brown testified that while driving people to the hospital, he was pulled over by

the police, taken to the police station and questioned.  *Id.* at pp. 469-71.

Jones then testified.  *Id.* at p. 676.  The defense briefly discussed Jones' prior

convictions and when Jones answered that he had committed the acts, the testimony

moved forward.  *Id.* at pp. 678-79.  Jones noted that he, Seymour, Williams, and Freddie

Brown had been friends for several years.  *Id.* at pp. 679-81.  Jones testified that on

October 1, 2001, approximately two weeks before the incident, he and Seymour were

talking with friends when Williams approached them.  *Id.* at pp. 681-683.  Jones stated

that Seymour and Williams began to argue, he left for a short time and when he returned,

he noticed Williams and others punching and kicking Seymour.  *Id.* at pp. 683-85.  Jones

testified he tried to break up the fight and after he separated Williams and Seymour, he

---

[5] Teikia Holifield, daughter of Charlotte Brown, confirmed that Freddie Brown began
shooting only after a shot had already been fired at Williams.  Trial Tr. at p. 523.

observed that Seymour had a knife in his hand.  *Id.* at pp. 685-86.  Jones stated Seymour

stabbed one of the other men and chased everyone else away.  *Id.* at pp. 686-87.

Jones testified that between October 1 and 14, other problems arose between he,

Seymour, Williams, and Freddie Brown.  *Id.* at pp. 687-95.  Jones stated that on one

occasion, Freddie Brown threatened to hurt Seymour because of the October 1 incident.

*Id.* at pp. 691-92.  He stated that on another occasion, he argued with Williams and

observed a knife in Williams' pocket.  *Id.* at pp. 693-95.  Jones testified that as a result of

these incidences, Seymour did not stay in his own home fearing that Freddie Brown or

Williams would shoot him.  *Id.* at pp. 695-96.  He also stated he and Seymour approached

family members of Freddie Brown and Williams in an attempt to resolve their problems but

he was not sure if anything was done.  *Id.* at pp. 697-98.

Jones testified that on the morning of October 14, while sitting on Seymour's porch,

he and Seymour noticed Freddie Brown and Williams down the street pick up what

appeared to be a gun from inside a house.  *Id.* at pp. 721-24.  Jones stated he made eye

contact with Williams, who smirked at him.  *Id.* at pp. 724-25.  Jones testified that he

became scared and yelled to them to meet him half way to talk about putting an end to the

fighting.  *Id.* at pp. 727-28.  As they approached each other, Jones stated Williams and

Freddie Brown both pointed their guns at him, which made him back up.  *Id.* at pp. 728-31.

Jones testified that Seymour came up from behind him, handed him a gun and then

Seymour fired a shot.  *Id.* at pp. 731-32.  Jones stated everyone began firing their guns

and when he noticed that Williams was hurt, the shooting ceased.[6]  *Id.* at pp. 732-33.

---

[6] Jones testified hat he never shot in the direction of any person, only at the ground.
Trial Tr. at pp. 789-90.

Jones testified that Freddie Brown went to help Williams and when he reached him, Brown picked up Williams' gun and again started shooting at Jones and Seymour. *Id.* at pp. 733-34.  Jones stated he ran away from the scene and threw his gun away. *Id.* at p. 734.

After a charge conference and summations, the court charged the jury. *Id.* at pp. 831-1001.  As to one specific jury charge involving principal and accomplice liability, the court stated that in order to hold Jones liable, the jury would have to find beyond a reasonable doubt that he acted with the state of mind required for the crime and that "he intentionally helped Jonah Seymour or aided Jonah Seymour to engage in that crime." *Id.* at p. 963.  The court told the jury that Jones' mere presence at the scene with the knowledge that the crime was taking place or even by mere association with the perpetrator would not in and of itself make Jones liable. *Id.*  The court described the prosecution's burden and contentions regarding this charge and stated

> [i]f six jurors believe the People have proven the defendant's guilt beyond a reasonable doubt because he was the principal, and six jurors believe that Mr. Seymour was the principal actor, and also concludes beyond a reasonable doubt that Tremayne is criminally liable for the conduct of Jonah Seymour, then under those circumstances, and also assuming that the People meet their burden with regard to the justification issue, you may return a verdict of guilty in that event.  In other words, all twelve jurors need not agree that the defendant was acting as a principal.  All twelve jurors need not agree that the defendant was acting as an accomplice[.]

*Id.* at pp. 964-65.

After concluding the charges, the jury found Jones guilty of manslaughter in the first degree, criminal possession of a weapon in the second degree, and attempted assault of Freddie Brown in the first degree. *Id.* at pp. 1001-61.  Judgment was entered by the Onondaga County Court and Jones was sentenced on September 4, 2002.  Judgment

was affirmed on appeal to the New York Supreme Court, Appellate Division, Fourth

Department on February 11, 2004.  *People v. Jones*, 771 N.Y.S.2d 441 (N.Y. App. Div. 4th

Dep't 2004).  Leave to appeal to the Court of Appeals was denied on May 14, 2004.

*People v. Jones,* 814 N.E.2d 472 (N.Y. Ct. of App. 2004).  This petition followed.

## II.  Discussion

### A.  Standard of Review

According to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

a federal court may not grant habeas relief to a state prisoner claim unless the state courts

adjudicated the merits of the claim and such adjudication either

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. §§ 2254(d)(1) & (2); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001); *see also*

*Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003).  The AEDPA also requires that in

any such proceeding, "a determination of a factual issue made by a State court shall be

presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption

of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Boyette*, 246 F.3d

at 88 (quoting § 2254(e)(1)).

### B.  Weight of the Evidence

Jones claims that the verdict rendered was against the weight of the evidence and

that the criminal possession of a weapon charge should never have been presented to the jury.  Am. Pet. at ¶¶ 12(a) & (d)(ii).  The Appellate Division found that the verdict was not against the weight of the evidence and the trial court properly submitted the possession of a weapon charge to the jury since the elements of such charge were established.  *People v. Jones*, 771 N.Y.S.2d at 441-42.

Unfortunately for Jones, weight of the evidence review is a product of New York state statute and therefore merely a state law issue.  *See* N.Y. CRIM. PROC. LAW § 470.15; *Cardena v. Giambruno*, No. 03CIV 3313(RWS), 2004 WL 239722, at *4 (S.D.N.Y. Feb. 10, 2004) (citations omitted); *see also People v. Bleakley*, 508 N.E.2d 672 (N.Y. Ct. of App. 1987).  It is well-established that habeas corpus review is not available for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991).  As such, no cognizable federal issue is presented by a habeas claim challenging the weight of the evidence adduced at trial.  *Cardena*, 2004 WL 239722, at *4; *Glisson v. Mantello*, 287 F. Supp. 2d 414, 441 (S.D.N.Y. 2003) (citing *Givens v. Burge*, No. 02 Civ. 0842 JSRGWG, 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003) (collecting cases)); *McBride v. Senkowski*, No. 98 CIV. 8663(MBM),  2002 WL 523275, at *4 n.2 (S.D.N.Y. Apr. 8, 2002) (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996)).  Thus, Jones is not entitled to federal habeas relief based upon his challenge to the weight of the evidence offered against him at trial.[7]  *See Camacho v. McKinney*, No. 04 Civ.2226 LAK, 2004 WL 1490308, at *1 (S.D.N.Y. July 1,

---

[7] Because Jones has only raised a claim alleging the verdict was against the weight of the evidence, this Court will construe this ground liberally as one challenging the sufficiency of the evidence.  *See McBride*, 2002 WL 523275, at *4 n.2 (construing claim of pro se petitioner alleging that verdict was against weight of evidence as challenge to sufficiency of evidence).

2004) ("[P]etitioner's first ground . . . arguing only that the verdict was against the weight of the evidence – [] raises no claim cognizable in a federal habeas corpus proceeding."); *Brown v. Fischer*, No. 03 Civ. 9818BSJAJP, 2004 WL 1171277, at *6 (S.D.N.Y. May 27, 2004) ("It is well-settled that a weight of the evidence claim is not cognizable on federal habeas review.") (citations omitted).

Even liberally construing Jones' claim as challenging the sufficiency of the evidence, Jones' claim fails. *See supra* n.5. A petitioner who challenges a conviction on the sufficiency of the evidence bears a "very heavy burden." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d. Cir. 2002). The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crimes with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original). A habeas petitioner claiming that there was insufficient evidence supporting the conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995). The reviewing court is required to consider the evidence in the light most favorable to the

prosecution, and draw all inferences in its favor.  *Jackson*, 443 U.S. at 319.[8]  "When

considering the sufficiency of the evidence of a state conviction, '[a] federal court must

look to state law to determine the elements of the crime.'"  *Ponnapula*, 297 F.3d at 179

(quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)).

    A person is guilty of manslaughter in the first degree when "[w]ith intent to cause

serious physical injury to another person, he causes the death of such person or of a third

person."  N.Y. PENAL LAW § 125.20(1).  In this case, the evidence at trial demonstrated that

Jones intended to cause serious physical injury to Williams when he began shooting and

that acting in concert with Seymour, caused the death of Williams.  *See* Trial Tr. at pp. 87-

88, 90, 97-102, 113, 207-13, 289-301, 324-33, & 458-59.

    A person is guilty of criminal possession of a weapon in the second degree "when,

with intent to use the same unlawfully against another . . . [h]e possesses a loaded

firearm[.]"  N.Y. PENAL LAW § 265.03(2) (2002).[9]  Again, the record established that Jones,

acting in concert with Seymour, obtained a weapon with the intent to use it unlawfully

against Williams and that he was in possession of a loaded firearm.  *See* Trial Tr. at pp.

97-102, 113, 326-33, 403-05, 424-25, & 731-33.

    Finally, a person is guilty of attempted assault in the first degree when, with intent to

cause serious physical injury to another, he engages in conduct which tends to effect the

---

[8]
  The *Jackson* standard is clearly established federal law as determined by the Supreme
Court.  *See Huber v. Schriver*, 140 F. Supp. 2d 265, 276 n.5 (E.D.N.Y. 2001) (citing
*Francis S. v. Stone*, 221 F.3d 100, 114 (2d Cir. 2000)) (other citation omitted); *see also
Santana v. Kuhlmann*, 232 F. Supp. 2d 154, 166-67 (S.D.N.Y. 2002).

    [9] N.Y. PENAL LAW § 265.03 has been amended since the time of Jones' conviction.

commission of such crime, namely causing the injury by means of a deadly weapon or dangerous instrument.  N.Y. PENAL LAW §§ 110.00 & 120.10(1).  Here, the evidence showed that Jones, acting in concert with Seymour, intended to seriously injure Freddie Brown, engaged in conduct which tended to effect that result, and did so by means of a deadly weapon.  *See generally* Trial Tr. at pp. 326-33, 459-62, & 523.

Considering the evidence in the light most favorable to the prosecution, and drawing all inferences in its favor, rational triers of fact could have found proof of guilt beyond a reasonable doubt on all three counts.  Therefore, the Appellate Division's decision was not contrary to, nor an unreasonable application of, clearly established federal law.

Accordingly, it is recommended that the petition on this ground be denied.

### C. *Batson* Claim

Jones alleges that the prosecution's peremptory challenge of jury panelist Theodis Mills constituted a *Batson* violation.  Am. Pet. at ¶ 12(b).  The Appellate Division found that Jones' *Batson* claim lacked merit because a single peremptory challenge "to a black prospective juror did not establish a pattern of purposeful exclusion sufficient to raise an inference of discrimination."  *People v. Jones*, 771 N.Y.S.2d at 444 (internal quotation marks and citation omitted).

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court articulated a three-part burden-shifting framework that the courts must employ to determine whether a particular peremptory challenge is based on an impermissible discriminatory motive in

violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 96-97.

Initially, a petitioner bears the burden of establishing a prima facie case of racial bias.

*Majid v. Portuondo*, 428 F.3d 112, 126 (2d Cir. 2005) (citing *Batson*, 476 U.S. at 97).  In

order to establish a prima facie case, "a [petitioner] must show facts and circumstances

that raise an inference that the prosecutor used the peremptory challenge to exclude

potential jurors from the petit jury on account of their race."  *Sorto v. Herbert*, 480 F.3d

609, 614 (2d Cir. 2007) (quoting *Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002)).

For example, as explained by the Supreme Court,

> a "pattern" of strikes against black jurors included in the particular venire might
> give rise to an inference of discrimination.  Similarly, the prosecutor's questions
> and statements during voir dire examination and in exercising his challenges
> may support or refute an inference of discriminatory purpose.

*Batson*, 476 U.S. at 96-97.

The Supreme Court further held that "a consistent pattern of official racial

discrimination is not a necessary predicate to a violation of the Equal Protection Clause.  A

single invidiously discriminatory governmental act is not immunized by the absence of

such discrimination in the making of other comparable decisions."  *Batson*, 476 U.S. at 96

(cited in *Walker v. Girdich*, 410 F.3d 120, 123 n.3 (2d Cir. 2005)) (internal quotation marks

omitted).  If a petitioner "points to a pattern of strikes as evidence of discrimination,

'statistical disparities are to be examined' as part of the Batson *prima facie* inquiry."  *Sorto*,

480 F.3d at 614 (quoting *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991)).

If a prima facie case is shown, the burden then shifts to the prosecution to provide

a race-neutral justification for its challenge to the particular juror.  *Majid*, 428 F.3d at 126.

Even if the prosecution's reasons for the challenge are "neither 'persuasive, nor even

plausible,' as long as those reasons are facially valid, the burden will then switch to the [petitioner] to prove that the reasons the prosecution gave are a pretext for purposeful discrimination." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).  Ultimately, the validity of the prosecution's explanation is a matter of credibility for the court to determine. *Id.* (citing *Batson*, 476 U.S. at 98 n.21).

Here, Jones has failed to establish a prima facie case that a violation occurred. Although a single instance of discrimination could constitute a violation, the facts and circumstances surrounding the peremptory challenge of jury panelist Theodis Mills did not create an inference of discrimination based upon Mills' race.  *See generally* Voir Dire Tr. The same basic questions were asked of all potential jurors and none of the prosecution's statements to the jury panel or other peremptory challenges raised any inferences of improper discrimination.  *See generally id.*

Even if Jones had established a prima facie case, the prosecution provided a race-neutral justification for its challenge.  The prosecution stated that Mills did not appear to be attentive to the court when he first entered the jury box.  *Id.* at p. 129.  Notwithstanding the fact that Jones may have found this reason to be neither persuasive nor plausible, the prosecution provided a facially valid reason for the challenge.  *See Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992) (stating that "[a]n impression of the conduct and demeanor of a prospective juror during the *voir[] dire* may provide a legitimate basis for the exercise of a peremptory challenge"); *Sutton v. Berbary,* No. 02 Civ. 3446(TPG), 2003 WL 22339275, at *1 (S.D.N.Y. Oct. 14, 2003) (finding prosecutor's explanation that he had a "gut reaction" based on a juror who was "not overly cooperative" and "not overly forthcoming" in

responding to questions to be race neutral).  Thus, the Appellate Division's decision was

not contrary to, nor an unreasonable application of, clearly established federal law.

Therefore, it is recommended that the petition be denied on this ground.

### D.  Jury Instructions

Jones claims that the trial court's jury instructions were confusing as well as

prejudicial when the trial court did not charge the jury that it must reach a unanimous

verdict regarding whether Jones was a principal or an accomplice.  Am. Pet. at ¶ 12(c).

The Appellate Division held the trial court properly charged the jury that Jones could be

found guilty as either an accessory or principal.  *People v. Jones*, 771 N.Y.S.2d at 442.

"[F]ederal habeas corpus relief does not lie for errors of state law."  *Lewis v. Jeffers*,

497 U.S. 764, 780 (1990).  The Supreme Court has stated that "it is not the province of a

federal habeas court to reexamine state-court determinations on state-law questions.  In

conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."  *Estelle*, 502 U.S. at 67-68

(citations omitted).

A state prisoner claiming that the trial court provided "improper jury instructions

faces a substantial burden."  *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002).

In order to obtain a writ of habeas corpus in federal court for an error in a state court's jury

instructions, a petitioner must "not only show that the instruction misstated state law but

that the error violated a right guaranteed to him by federal law."  *Davis v. Strack*, 270 F.3d

111, 123 (2d Cir. 2001) (citations omitted).  Stated another way, the Supreme Court has

*-17-*

held that the court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, . . . not merely whether the instruction is undesirable, erroneous, or even 'universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).  Furthermore, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146-47 (citing *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

Here, in regards to the principal and accomplice charge, the court stated that in order to hold Jones liable, the jury would have to find beyond a reasonable doubt that he acted with the state of mind required for the crime and that "he intentionally helped Jonah Seymour or aided Jonah Seymour to engage in that crime."  Trial Tr. at p. 963.  The court further described that

> [i]f six jurors believe the People have proven the defendant's guilt beyond a reasonable doubt because he was the principal, and six jurors believe that Mr. Seymour was the principal actor, and also concludes beyond a reasonable doubt that Tremayne is criminally liable for the conduct of Jonah Seymour, then under those circumstances, and also assuming that the People meet their burden with regard to the justification issue, you may return a verdict of guilty in that event.  In other words, all twelve jurors need not agree that the defendant was acting as a principal.  All twelve jurors need not agree that the defendant was acting as an accomplice[.]

*Id.* at pp. 964-65.

Under New York law, "whether the defendant was the actual perpetrator of the crime or liable as an accessory thereto is irrelevant.  There is no distinction between liability as a principal and criminal culpability as an accessory and the status for which the defendant is convicted has no bearing upon the theory of the prosecution." *People v.*

*Duncan*, 385 N.E.2d 572, 576 (N.Y. Ct. of App. 1978); *see also People v. Forsythe*, 798

N.Y.S.2d 645, 647 (N.Y. App. Div. 4th Dep't 2005) (quoting *People v. Rivera*, 646 N.E.2d

1098, 1101 (N.Y. Ct. of App. 1995) for the proposition that "[t]he key to understanding

accessorial liability is that whether one is the actual perpetrator of the offense or an

accomplice is, with respect to criminal liability for the offense, irrelevant").  Thus, the trial

court's jury instruction did not misstate the state law regarding principal and accomplice

liability.  Furthermore, the trial court never stated that Jones could be convicted on any of

the counts or lesser included charges by anything other than a unanimous verdict.  *See*

*generally* Trial Tr. at pp. 960-1001.  Viewed in the context of the overall charge, the trial

court did not commit an error during jury instructions that violated due process.

Accordingly, the Appellate Division's determination was not contrary to, nor did not involve

an unreasonable application of, clearly established federal law.

    Therefore, it is recommended that the petition on this ground be denied.


## E.  Sandoval Ruling

    Jones alleges the trial court erred in its initial *Sandoval* ruling as well as its

application when the court denied a motion for a mistrial based on the testimony of

William Brown in which Jones's prior criminal record was mentioned.  Am. Pet. at ¶

12(d)(I).  The Appellate Division held this contention to be without merit.  *People v. Jones*,

771 N.Y.S.2d at 442.

    In a *Sandoval* hearing, the court determines "whether, if the defendant testifies, his

prior convictions may be admitted to impeach his credibility."  *Shannon v. Senkowski*, No.

00 Civ. 2865(NPB),  2000 WL 1683448, at *6 (S.D.N.Y. November 9, 2000); *see also*

*People v. Sandoval*, 34 N.Y.2d 371, 374 (1974).  In *Sandoval*, the court stated that

> 'the rules governing the admissibility of evidence of other crimes represent a
> balance between the probative value of such proof and the danger of prejudice
> which it presents to an accused.  When evidence of other crimes has no
> purpose other than to show that a defendant is of a criminal bent or character
> and thus likely to have committed the crime charged, it should be excluded.'
> Thus, a balance must here be struck between the probative worth of evidence
> of prior specific criminal, vicious or immoral acts on the issue of the defendant's
> credibility on the one hand, and on the other the risk of unfair prejudice to the
> defendant, measured both by the impact of such evidence if it is admitted after
> his testimony and by the effect its probable introduction may have in
> discouraging him from taking the stand on his own behalf.

*Sandoval*, 34 N.Y.2d at 375.

A "trial judge is given broad discretion to determine what evidence should be admissible in

balancing the interest of the People in impeaching the defendant's testimony with the risk

of unfairly prejudicing the defendant."  *Nieves-Delgado v. New York*, 2003 WL 21310815,

at *3 (S.D.N.Y. June 9, 2003) (citing *Domingo v. Greiner*, 2002 WL 362761 (S.D.N.Y.

March 5, 2002) & *People v. Walker*, 633 N.E.2d 472 (N.Y. Ct. of App. 1994)).

Because the introduction of prior convictions against the defendant is evidentiary in

nature, it is "not redressable in a federal *habeas corpus* proceeding absent a showing that

the particular efforts were of constitutional magnitude."  *Shannon*, 2000 WL 1683448, at

*6 (citations omitted); *see also Estelle*, 502 U.S. at 67-68.  Furthermore, the evidentiary

error alleged must have had a "substantial and injurious effect or influence in determining

the jury's verdict."  *Rosa v. Davis*, No. 03 Civ.4835 RJH, 2006 U.S. Dist. Lexis 64805, at

*23 (S.D.N.Y. Aug. 18, 2006) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Notwithstanding, in *Estelle*, the Supreme Court specifically declined to reach the question

of whether the use of "prior crimes or bad acts" actually violates the Due Process clause of the Fourteenth Amendment.  502 U.S. at 75 n.5.

In regard to the ruling, the trial court held that after balancing the probative value versus prejudice, the prosecution could inquire into a 1996 possession of a controlled substance conviction, but no other prior convictions.  Hr'g Tr. at pp. 24-25.  The trial court did not err in making this ruling as the trial judge is given broad discretion to determine what evidence should be admissible.  Additionally, because the Supreme Court has yet to take a position on this issue, the Appellate Division's determination that Jones's contention was without merit did not violate clearly established federal law under the AEDPA standard.  *See Roberts v. Phillips*, No. 03-CV-2957 (NGG), 2004 WL 502920, at *3 (E.D.N.Y. Feb. 4, 2004); *Allaway v. McGinnis*, 301 F. Supp. 2d 297, 3000 (S.D.N.Y. 2004).

As for the claim that the trial court erred in failing to grant the motion for a mistrial based upon William Brown's testimony that he knew Jones "from doing a bid," Jones' constitutional rights were not violated.  Trial Tr. at p. 53.  After the statement was made, the defense forthwith objected and made a motion, which caused the court to immediately clear the jury out of the courtroom.  *Id.*  The court stated that a curative instruction would be proper, but the defense declined.  *Id.* at pp. 55-56.  The court denied the motion for a mistrial but ordered the testimony stricken.  *Id.* at pp. 56 & 84.

Even though Jones claims that the admission of William Brown's testimony violated his rights, "the admission of prior bad act evidence is perfectly appropriate, as long as the evidence is admitted for some proper purpose, other than to show criminal propensity . . .

*-21-*

[and] Federal Rule of Evidence 404(b) explicitly endorses this principle[.] " *Roberts*, 2004 WL 502920, at *3. William Brown's statement was not used to show criminal propensity and was instead made clearly for the purpose of establishing how he became acquainted with Jones. Moreover, Brown did not explicitly state that they had been in jail together but only made the comment they had done a "bid" together. Thus, the Appellate Division's decision was not contrary to, nor did not involve an unreasonable application of, clearly established federal law.

Therefore, it is recommended that the petition on this ground be denied.


### III.  Conclusion

For the reasons stated herein, it is hereby

**RECOMMENDED** that the amended petition for a writ of habeas corpus (Dkt. No. 5) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of HHS*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. r. Civ. P. 72, 6(a), & 6(e).

Date:   December 5, 2007
      Albany, New York

*David R. Homer*
United States Magistrate Judge